3961.  CENTRAL OF GEORGIA RAILWAY CO. *v.* PELFRY.

1. Ordinarily a railway engineer is not bound to keep a lookout for a trespasser, and owes him only the duty to use ordinary care not to injure him after his presence in a perilous position has been discovered; but if, with knowledge of the company, its tracks at a given point have been used for many years longitudinally by pedestrians as a footway, the amount of care and caution required in running the trains is to some extent to be measured by the frequency and publicity of such use.
2. If a railway engineer sees a person lying on the track at some distance away, and honestly mistakes him for an inanimate object, failure to check the speed of the train or take other precautionary measures will not render the company liable. But if, after seeing a suspicious object upon the track at such distance that it can not be distinguished, the engineer increases the speed of the train, takes his eyes from the track, and, after approaching too near to stop the train, again looks around, and for the first time discovers a human being prone upon the track, in a helpless condition, and runs over and kills him, the company will be liable, even though the deceased was a trespasser, and without regard to whether his perilous position was the result of his voluntary act or not. Especially is this true if the homicide occurs at a place where the track has for many years been used as a footway by pedestrians in such a frequent and public way as that employees of the company must have known of the use. Under the circumstances, the omission of the engineer to make any effort to check the train will be deemed so reckless as to amount in law to wantonness.
3. A killing may be wanton though not intentional in fact; for where a homicide results from gross carelessness and a reckless disregard of the rights of others, the natural consequences of the reckless act will be presumed to have been intended.
4. Applying the foregoing principles to the facts of the present case, the verdict was warranted, and no substantial error was committed during the trial.

DECIDED MAY 7, 1912.

Action for damages; from city court of Athens—Judge West. December 4, 1911.

*Harris & Harris, Shackelford & Shackelford, John B. Harris,* for plaintiff in error.

*E. R. Lambert, J. S. Grant, S. H. Sibley,* contra.

POTTLE, J.  The plaintiff's husband was run over and killed while lying down upon the defendant's track.  He had been drinking, and, a short time before the homicide, was seen on the defendant's trestle with a sack of flour, weighing 50 pounds, on his shoulder.  At that time he was very drunk, fired his pistol promiscuously, and, when warned that a train would come along in a few minutes, remarked that he "had a gun to stop anything—he

didn't care anything about the train." He walked on across the trestle about a quarter of a mile beyond, and evidently lay or fell down across the track in a drunken stupor. The sack of flour fell beside him, and between him and the train which ran over him. The train was behind time, and when it came upon the trestle the engineer saw a white object at a point on the track where the man was lying. He says he thought the object was a white piece of paper or something of that sort. He inquired of the fireman what it was, and the fireman replied that he did not know. Thereupon the engineer increased the speed of the train, or, to use his own language, "rawhided his engine pretty hard," in order to make up the lost time. It was a clear day and there was nothing to obscure the engineer's vision. While the track curved slightly at the end of the trestle, the track was straight and the view unobstructed from the point of the curve to the place where the homicide occurred. After going some distance and arriving within 150 or 200 feet of where the white object was on the track, the engineer said he "looked around and discovered it was a man." In another portion of his testimony he testifies that his eyesight was good, and that he continued to look up the track after seeing the white object, and did not discover the presence of the plaintiff's husband on the track until it was too late to stop the train, after doing everything it was possible for him to do to accomplish this purpose. The place where the deceased was killed was some 700 yards from the nearest public crossing, between the stations of Whitehall and Sidney. There were woods on each side of the track for some distance, and few, if any, houses. There was some evidence that pedestrians had been accustomed to use the track to go from Whitehall across the trestle to Sidney and beyond, it being about a mile and a half by rail and some four or five miles around by the dirt road, but there was no evidence that the company's employees in charge of the train knew of this custom, though there was some evidence that there was a well-worn path between the tracks, which had been made by pedestrians. The jury found for the plaintiff $1,500, and the defendant's motion for a new trial was overruled. It excepted.

There may have been some inaccuracies in the charge, but the case really turns upon the question whether the plaintiff was entitled to recover under that view of the evidence most favorable

to her contentions. It is inferable from the argument that if a recovery was authorized, both sides are satisfied with the amount of the verdict, or at least that the plaintiff in error is not complaining. We will, therefore, not notice the special assignments of error further than to say that under our view of the law, no such substantial error was committed as would justify us in setting aside the verdict in the plaintiff's favor.

Manifestly the deceased was a trespasser, and ordinarily a railway company owes such a one no duty except not to injure him wilfully or wantonly, or, to express it somewhat differently, to use ordinary care for his safety after his presence in a perilous position has been discovered. *Kendrick* v. *Seaboard Air-Line Ry.*, 121 *Ga.* 775 (49 S. E. 762); *Gulf Line Ry. Co.* v. *Way,* 137 *Ga.* 109 (72 S. E. 917). Applying this rule, it has been many times held that no recovery can be had for injury to or death of one trespassing on the company's tracks, when the employees did not know and had no reason to anticipate his presence at the time when and place where he was injured or killed. In such a case the act of the trespasser is one of such gross negligence as to preclude a recovery, even though the employees in charge of the engine may likewise have been guilty of negligence, in failing to keep a lookout down the track. *Raden* v. *Georgia Railroad,* 78 *Ga.* 47; *Central R. Co.* v. *Smith,* 78 *Ga.* 694 (3 S. E. 397), s. c. 82 *Ga.* 801; *Wilds* v. *Western R. Co.,* 82 *Ga.* 667 (9 S. E, 595); *Parrish* v. *W. & A. R. Co.,* 102 *Ga.* 285 (29 S. E. 715, 40 L. R. A. 364). In all of the foregoing cases the injury occurred at night. In *Leach's* case, 91 *Ga.* 419 (17 S. E. 619, 44 Am. St. R. 47), recovery was denied where the trespasser was killed in the daytime, on a trestle, and was not discovered in time to have stopped the train. Cases may arise, however, where the company would be under a duty to anticipate the presence of a trespasser upon the track and to take proper precautions to prevent injury to him. *Ashworth* v. *Sou. Ry. Co.,* 116 *Ga.* 635 (43 S. E. 36, 59 L. R. A. 592). The rule as to the company's duty in such cases was applied in *Shaw* v. *Georgia Railroad,* 127 *Ga.* 8 (55 S. E. 960), where it appeared that the tracks of the company were constantly being used longitudinally by pedestrians, with the knowledge of the section foreman, at the place where the homicide occurred. In that case authorities were approvingly cited for the proposition that "where

no permission is given, but there is a habit on the part of individuals or the public of traveling over the track on foot, and nothing is done to prevent it, that does not modify or change the legal rights or obligations of either the public or the company. By such use the public are not tacitly licensed to go upon the track, and the consent of the company to the use is not implied; but the fact that they do go there enters into the situation as it is known to the company, and affects the caution and amount of care required in running the trains." This court in *Waldrep's* case, 7 *Ga. App.* 342 (66 S. E. 1030), recognized the soundness of the general rule just quoted, but declined to apply it in favor of one trespassing in a switch-yard, because, as was said by Judge Russell, the inference of implied invitation to use tracks in a switch-yard "is so inconsistent with the continuous use of its tracks for switching purposes as not to admit of the presumption that there is an invitation or permission granted by the railroad to the public." The Supreme Court likewise declined to apply the doctrine of implied invitation to use a railway trestle in favor of a bridge watchman, whose wife was killed on a trestle, which she had been for some time using as a footway with the knowledge of certain subordinate employees, including the section foreman, but without knowledge on the part of the servants in charge of the train. *Comer* v. *Hill,* 101 *Ga.* 340 (28 S. E. 856). Without reference to whether that decision may conflict with the later ruling in the *Shaw* case, the latter is controlling upon us, because the former decision was concurred in by only three justices. In *Gulf Line Ry. Co.* v. *Way,* supra, "it did not appear from the petition whether few or many pedestrians were accustomed to walk along or near the defendant's track at the place of the homicide."

The doctrine of the code, that recovery can not be had for a homicide if the deceased could by the exercise of ordinary care have avoided the consequences of the defendant's negligence, has no application to a case like the present, because the duty to avoid negligence does not arise until after the negligence "is existing, and is either apparent, or the circumstances are such that an ordinarily prudent person would have reason to apprehend its existence." *Western & Atlantic R. Co.* v. *Ferguson,* 113 *Ga.* 708 (39 S. E. 306, 54 L. R. A. 802). If the defendant was negligent here at all, the negligence came into existence at a time when the

plaintiff's husband was in such a condition that he could not have done anything to avoid the consequences of the negligence. The real question in the case, therefore, is whether the act of the deceased in voluntarily going upon the track in a drunken condition was an act of such gross negligence as that it can be said his homicide was in a legal sense "done by his consent" or was caused solely "by his own negligence." Civil Code (1910), § 2781. If it was, then his widow can not recover, but if not, and if the company was negligent, she may recover, even if the deceased was himself at fault. The common-law doctrine of contributory negligence is not of force in this State, but where both parties are at fault, the injured party may recover if his negligence was not equal to or greater than that of the party inflicting the injury, and if he could not by the exercise of ordinary care have avoided the consequences of the other's negligence after it came into existence. In the *Way* case, supra, recovery was denied, but it affirmatively appeared that Way voluntarily and unnecessarily sat down on a cross-tie and subsequently became unconscious, and the Supreme Court pointed out the difference between that case and one where a person on the track suddenly became unconscious and fell down in that condition upon the track.

While the rule is well settled that in case of the death of a trespasser, recovery can be had only where the homicide was the result of wanton or wilful conduct on the part of the servants of the defendant, it is a mistake to assume that the homicide must be shown to have been intentional in point of fact; for if the conduct of the defendant's servants was so reckless as to evidence an utter disregard of consequences, the law would imply wilfulness and an intention to do the wrong. *Southern Ry. Co.* v. *Chatman,* 124 *Ga.* 1030 (53 S. E. 692, 6 L. R. A. (N. S.) 283, 4 Ann. Cas. 675). One may be convicted of murder even where he did not intend to kill, and even where he had no malice against the person killed. He may recklessly shoot into a crowd, intending merely to frighten, and kill a man whom he has never seen and against whom he has no ill will; but the homicide would be murder. And so, if an engineer should see one lying on the track in an apparently helpless condition, he would have no right to assume that the person would leave the track in time to save himself. To run him down under such circumstances would be such gross negligence and recklessness as would amount in law to wantonness.

There are two lines of decisions in reference to the duty of an engineer when he sees a suspicious object which proves to be a human being upon the track, and can not perceive what it is. One line holds broadly that the engineer need take no precautions, such as to slacken the speed, until he advances far enough to see that the object is a human being. Thus, in L. R. M. R. & T. R. Co. *v.* Haynes, 47 Ark. 497 (1 S. W. 774), it was held: "Though an engineer sees one lying upon the track at a distance before him, yet if he honestly mistakes him for some inanimate object until it is too late to avoid running over him, the company is not liable for the mistake and injury." To the same effect is Tucker *v.* Railway Co., 92 Va. 549 (24 S. E. 229), where the object was lying in a ditch on the side of the road-bed. An illustration of the other line of decisions is found in Keyser *v.* Chicago & Grand Trunk Ry., 56 Mich. 559 (23 N. W. 311, 56 Am. Rep. 405), re-affirmed in 66 Mich. 390 (33 N. W. 867), where it was ruled: "It is negligence not to slacken the speed of a train so that it can be stopped if necessary, if the engineer has seen an object on the track a long way off and can not tell what it is." See, also, East Tenn. R. Co. *v.* St. John, 5 Sneed (Tenn.), 524 (73 Am. D. 149) ; Hyde *v.* Union Pacific Ry. Co., 7 Utah, 356 (26 Pac. 979). Compare Burg *v.* Chicago Ry. Co., 90 Iowa, 106 (57 N. W. 680, 48 Am. St. Rep. 419).

In commenting upon these two lines of decisions Judge Thompson, one of the most eminent commentators on the law of negligence and on corporation law generally, says: "We now come to a class of decisions, very questionable, and from many points of view very regrettable, which are to the effect that the engineer in charge of a railway train, upon discovering an object on the track, which may or may not be a human being, is under no duty, as a matter of law, to slacken the speed of his train before the nature of the object is known. According to the doctrine of these cases, he is not obliged to slacken the speed of his train merely because he has doubts as to the nature of the object, unless, for some reason, he has cause to believe that it will not leave the track; but he is entitled to drive his train forward, although at a great rate of speed, until he has an opportunity of inspecting the object, and of discovering what it is,—after which it will generally be too late to avert injury to the object if it turns out to be a human being;

and notwithstanding the further fact that, by so doing, he may derail his train and kill or injure the passengers or other persons on board of it." 2 Thomp. Neg. § 1740.

A railroad track is a place of danger anywhere and at any time, and one who trespasses upon the track is guilty of negligence. If he goes upon the track at a time when a train is due, and in a condition in which he can not help himself when the danger arises, he is guilty of gross negligence. But, while this is true, yet when the company discovers this negligence or has reason to anticipate it, it must use ordinary care to prevent injury to the trespasser; and where he is on the track in an apparently helpless condition, certainly ordinary diligence would require the use of every means at hand to keep from running him down and killing him. If, under such circumstances, the company's servants fail to exercise this degree of care, and death results, the killing will be deemed in law to have been wilful and wanton. Contributory negligence on the part even of a trespasser never defeats recovery for a wanton homicide.

In the light of these principles we come to a discussion of the facts of this case: The deceased and the sack of flour were together on the track. The engineer saw a white object (probably the flour sack) at a point where deceased was lying. The sack weighed 50 pounds and the man 140 or 150 pounds. The day was clear; the track was straight and free from obstructions. The engineman says he thought the object was a piece of paper, just like he was accustomed to seeing often on the track; but, if so, why did he ask what the object was, and why did the fireman answer that he didn't know, or couldn't tell? The inquiry and the answer show that the object was of a suspicious nature. Again, if he saw the flour, why did he not see the man, who weighed 100 pounds more than the flour? What was the engineer's duty under the circumstances? Did he have a right to "rawhide" his engine, as he says he did, in utter disregard of what the object might prove to be? The jury could well find that he saw the man, though he did not know it was a man until too late to stop. Will the courts set such little store by human life as to hold, as a matter of law, that when a person is lying helpless on a track, the engineer may increase the speed of his train and run him down and kill him, merely because he can not certainly tell when he sees the object on the track that

it is a human being? Shall human lives be sacrificed in this way in the interest of speed and the making of schedules? Which was more important, that six minutes lost time should be made up, or that the life of this man should have been saved at the risk of losing a few more minutes of time? These were questions which doubtless arose in the minds of the jury, and, in our opinion, were proper subject-matter of inquiry, under the facts of this case and the law applicable thereto. Moreover, it does appear, from a number of witnesses, that for many years pedestrians generally had been using the track as a footway, with at least the tacit acquiesence of the company. According to some of the witnesses, this use was so general that the section foreman must have known of it. Indeed, he testified himself that he met the plaintiff's husband on the trestle just before he was killed and saw two others walking across about the same time. Under the decision of the Supreme Court in the *Shaw* case and cases therein cited, evidence of this use of the track by pedestrians was proper matter for consideration by the jury, as affecting "the caution and amount of care required in running the trains."

It must be borne in mind that in dealing with facts after verdict, this court can only inquire whether, under the law, anything upon which a recovery could properly have been based is disclosed by the evidence. The evidence demanded a finding that the deceased was grossly negligent; but it also authorized a finding that, under all the circumstances, the failure of the engineer to check the speed of his train was, legally speaking, so wanton as to authorize a recovery of some amount. Certain it is that after seeing the object, it was at least the duty of the engineer to fasten his vision on the track until he got near enough to distinguish what was on the track. He says he did this, but there were facts and circumstances in evidence from which the jury could conclude that he did not.

Counsel for the plaintiff in error relied in part upon *Moore* v. *Southern Railway Co.*, 136 *Ga.* 872 (72 S. E. 403). That case, however, upon its facts differs materially from this. There the person killed was sitting on a cross-tie, in a dark night, and was behind weeds and bushes as high as a man's head, which prevented him from seeing the engine and prevented the engineer from seeing him. Several hundred yards away the engineer saw an object, but thought it was a dog, and naturally supposed the dog would leave

the track, and there was nothing to suggest that if the object was a man he was helpless or in a position of peril. The case of *Southwestern Railroad* v. *Hankerson, 61 Ga.* 115, is also relied on. There the engineer saw an object on the track, which he took to be a hog. Under his instructions from his superiors, he never stopped for hogs, but took chances upon their getting out of the way. The ruling made in the case is broad—very broad—to the effect that "if one voluntarily becomes drunk, and consequently falls down, or lies down, in a state of insensibility on a railroad track, so that he is injured by a passing train, he can not recover for injuries so received, even though there may have been contributory negligence on the part of employees of the road." The court did not discuss the question of checking the speed of the train, to ascertain what a suspicious-looking object really was, and no such question was involved in the case. The engineer did not say he could not distinguish the object, but, on the contrary, stated positively he thought it was a hog, and, so believing, did not stop. If he had said he saw an object which might have been a hog, but he didn't know what it was, and, upon inquiry of his fireman as to what the object was, the fireman had said he didn't know either, and then the engineer had increased the speed of the train and had taken his eyes from the track, and "looked around" again, and saw a man when it was too late to stop, the case would have been like the present one, and we apprehend the ruling would have been different. We can not believe that the Supreme Court meant to hold in the *Hankerson* case that because a man may get drunk and lie down on the track, he forfeits his life to those in charge of the railroad company, or that its servants in charge of one of its trains have the right to run over him and kill him wantonly and wilfully. As we hold that the evidence in the present case justified a finding that the engineer was guilty of such recklessness as amounted to wantonness, we do not think the ruling in the *Hankerson* case, properly understood, applies. Besides, there was no evidence in that case of any habitual and general use of the track by pedestrians at the point of the injury.

Our conclusion is that the judgment should be          *Affirmed.*